[No. B126659. Second Dist., Div. Three. Sept. 28, 2000.]

FEDERATION OF HILLSIDE AND CANYON ASSOCIATIONS et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Lawrence Teeter for Plaintiffs and Appellants.

James K. Hahn, City Attorney, Patricia V. Tubert and Susan D. Pfann, Assistant City Attorneys, for Defendants and Appellants.

**OPINION**

**CROSKEY, Acting P. J.**—Federation of Hillside and Canyon Associations (FHCA), a homeowners advocacy group, and Coalition Against the Pipeline (CAP), an environmental advocacy group (collectively, Petitioners), challenged the certification by City of Los Angeles and Los Angeles City Council (collectively, the city) of an environmental impact report (EIR) concerning an amendment to the city's general plan. They maintained that the EIR was deficient, that there was no substantial evidence to support the city's findings, and that the city had failed to recirculate the draft EIR upon the release of a transportation plan affecting the amended general plan. The trial court found that the city had failed to circulate the transportation plan and ordered the city to do so but rejected Petitioners' other challenges.

Petitioners appeal that part of the judgment denying their petition. They contend there is no substantial evidence to support the city's findings that mitigation measures will significantly reduce the amended general plan's adverse impacts on transportation and that water resources will be sufficient, the EIR does not adequately address reasonable alternative plans, and it does not adequately address the impact of population growth.

The city appeals that part of the judgment ordering it to circulate the transportation plan, contending its decision not to do so was supported by substantial evidence and therefore was proper.

### FACTUAL AND PROCEDURAL BACKGROUND

The city recently adopted a general plan framework (GPF) as part of its general plan. It notified public agencies and interested organizations that it was preparing the GPF and a draft EIR and solicited comments in July 1994. After receiving comments, it completed the proposed GPF and draft EIR and provided public notice and an opportunity to review and comment beginning in January 1995.

The proposed GPF addressed land use, housing, infrastructure, transportation, and other elements of the general plan. It stated that it was designed to provide a long-term strategy to accommodate the anticipated future growth in population and employment and to serve as a guide to amend in the future the more detailed land use plans in the city's 35 (now 37) separate community plans. It stated that the anticipated growth would severely impair transportation and accessibility unless dramatic new measures were undertaken. Specifically, it projected a 35 percent increase in vehicular traffic and a 50 percent decrease in average highway travel speeds by the year 2010, assuming that the then currently funded traffic improvement programs were implemented and no others.

The GPF proposed several operational and physical improvements to traffic systems and infrastructure, policies to encourage the use of public transit and reduce vehicle trips, and other measures to reduce traffic congestion and improve accessibility. It identified several programs necessary to implement the GPF, including a proposed Transportation Improvement Mitigation Plan (TIMP), described as a program to mitigate the transportation impacts of the GPF's land use and growth policies. It also called for the development of a general plan transportation element, superseding the prior circulation element, to describe specific proposals in greater detail. The GPF provided for the city to continue to monitor population and employment growth and the effects on transportation.

The GPF stated that the city would "accommodate [the] projected population and employment growth" (Policy 3.3.1) and would monitor growth and its effects on infrastructure and service capacities annually in order to "consider regulating" development if the infrastructure remains inadequate (Policy 3.3.2(d)). It also stated that the city would increase the GPF's growth projections if and when transportation improvements and other effective

mitigation measures are implemented. (Policy 3.3.2(b).) *However, it did not require that the mitigation measures be implemented as a condition of the development allowed under the GPF.*

The draft EIR analyzed the environmental impacts of the GPF, TIMP, and related planning and zoning code amendments. It stated that the GPF would result in significant increases in traffic congestion and would reduce average freeway speeds by as much as 50 percent by the year 2010. However, it stated that the mitigation measures included in the TIMP would reduce those impacts to a level of insignificance. It also proposed further mitigation measures, including greater support for zero-emission and low-emission vehicles, greater expansion of bus and rail transit systems, and other measures. It stated that the mitigation measures would reduce the cumulative significant effects on transportation "to the extent feasible."

The city completed the proposed TIMP in February 1995, after it had circulated the proposed GPF and draft EIR. It made the TIMP available to the public in February 1995 but did not provide formal public notice or recirculate the draft EIR at that time. The TIMP included several proposals to improve the existing transportation infrastructure and increase its capacity, provide additional rail and bus transit, and encourage greater use of public transit and telecommuting. It stated that to implement the proposals would require the cooperative efforts of several state, local, and federal public agencies, together with the city, at a cost of approximately $12 billion over 20 years. It stated that a substantial portion of the cost must be borne by state and regional agencies, and that a preliminary analysis indicated that *the city's portion of the cost would far exceed its anticipated revenues,* including revenues from Proposition C local return funds, gasoline taxes, development fees, street dedications and improvements related to private development, and the city's general fund.

The city received comments to the proposed GPF and draft EIR in writing and at several public hearings held by the city's department of city planning and planning commission through July 1995. After several amendments, the city produced a final EIR in June 1996 and an amended GPF in July 1996. Both documents cited and relied in large part on the TIMP mitigation measures to alleviate the significant effects on transportation. The final EIR stated, in its summary and transportation sections, that the effects on transportation were significant but could be substantially reduced through mitigation. However, it stated in the section discussing cumulative effects that even with the mitigation measures *the cumulative impact of the GPF would cause significant, unavoidable adverse effects on the Los Angeles region.*

The city also prepared a document entitled Proposed CEQA Findings and Statement of Overriding Considerations (Proposed Findings) in July 1996. The Proposed Findings stated that the GPF's land use policy and the mitigation measures identified in the TIMP and final EIR would avoid or substantially reduce the significant impacts on transportation. *However, it also stated that even with mitigation the cumulative impact on transportation would be significant and unavoidable.* It discussed several alternatives to the GPF, concluded that they would not achieve the city's central objectives and were infeasible, and found that specific overriding considerations out-weighed the unavoidable significant effects on the environment. Those overriding considerations included the conclusions that the GPF would manage growth that was likely to occur with or without effective manage-ment, strengthen the city's economic base, protect the character of residen-tial neighborhoods by encouraging growth in commercial districts, accom-modate increased housing needs, and otherwise contribute to the quality of life in Los Angeles while minimizing adverse environmental effects.

The city council held a public hearing on the project in July 1996 and amended the GPF. After further public hearings before the planning com-mission and city council, the city approved the GPF, adopted the Proposed Findings, and certified the final EIR at a public hearing in December 1996.

Petitioners filed a petition for writ of mandate in the superior court in January 1997, challenging the sufficiency of the EIR and the city's failure to recirculate the draft EIR after releasing the TIMP. They argued that, in light of the statement in the TIMP, the city's projected revenues were inadequate to meet its share of the TIMP's substantial costs, the mitigation measures upon which the draft EIR relied were infeasible, that the mitigation measures depended upon the cooperation of other public agencies and funding from those agencies was highly speculative, and that there was no substantial evidence to support the finding that the significant effects on transportation would be mitigated. They also argued that there was no substantial evidence to support the city's finding that water resources would be sufficient, that the EIR did not adequately address feasible alternative plans and the impact of population growth, and that the city's failure to recirculate the draft EIR after the TIMP was released invalidated the EIR. The trial court concluded that the city was required to circulate the TIMP for review and comment and ordered the city to do so, but rejected Petitioners' other challenges to the EIR.

## CONTENTIONS

Petitioners contend (1) there is no substantial evidence to support the city's findings that the mitigation measures will significantly reduce the

significant effects on transportation and that water resources will be sufficient, (2) the EIR does not adequately address feasible alternative plans, and (3) the EIR does not adequately address the impact of population growth. The city contends its decision not to circulate the TIMP was supported by substantial evidence and therefore was proper.

## DISCUSSION

### 1. *CEQA Requirements*

The California Environmental Quality Act (CEQA) declares that the maintenance of a quality environment is a matter of statewide concern. (Pub. Resources Code,[1] § 21000, subd. (a).) It requires state and local public agencies to consider the environmental impacts of their activities and prepare an EIR for any project that may have a significant effect on the environment. (§§ 21100, subd. (a), 21151, subd. (a).) The purpose of an EIR is to inform decision makers and the public of the potential environmental impacts of a project and to identify feasible alternatives to the project and measures to mitigate or avoid the adverse effects. (§ 21002.1, subd. (a).) The EIR must identify the significant effects on the environment, state how they can be mitigated or avoided, and identify alternatives to the project, among other requirements. (§ 21100, subd. (b).) ██ ██ The EIR serves as an informational document for the agency and the public but does not control the agency's exercise of discretion. (Guidelines, § 15121.)[2]

The agency must notify the public of the draft EIR, make it available for public review and comment, and respond to comments. (§§ 21092, 21091, subd. (d)(2)(A).) When significant new information shows that the project will have a different or more severe effect on the environment, the agency must notify the public and recirculate the draft EIR for review and comment. (§ 21092.1; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1129-1130 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*); Guidelines § 15088.5, subd. (a).) Before approving the project, the agency must certify that the final EIR was completed in compliance with CEQA and that the agency reviewed and considered the final EIR. (Guidelines, § 15090.)

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

[2] All references to "Guidelines" are to the current state CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). Cited Guidelines are the same as the versions effective in 1996 unless otherwise stated. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

An agency cannot approve a project if the EIR identifies significant environmental effects unless the agency finds that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effects; (2) those measures are within the jurisdiction of another public agency and have been adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in the EIR infeasible and specific overriding economic, legal, social, technological, or other benefits outweigh the significant environmental effects. (§ 21081.)

2. *Judicial Review and Appeal*

A proper party may petition for a writ of mandate to challenge the sufficiency of an EIR or the validity of an act or omission under CEQA. (§ 21167, subds. (c) & (e); Code Civ. Proc., § 1085, subd. (a).) ▮ The standard of review of a quasi-legislative agency decision under CEQA is abuse of discretion. (§ 21168.5.) Abuse of discretion means the agency did not proceed as required by law or there was no substantial evidence to support its decision. (*Ibid.*) In reviewing the adequacy of an EIR, the court does not determine whether the agency's factual determinations were correct but only decides whether they were supported by substantial evidence. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 392-393.) Challenges to the scope of the analysis, the methodology for studying an impact, and the reliability or accuracy of the data present factual issues, so such challenges must be rejected if substantial evidence supports the agency's decision as to those matters and the EIR is not clearly inadequate or unsupported (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1620 [45 Cal.Rptr.2d 688]; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1999) § 12.5, pp. 464-465), unless the agency applied an erroneous legal standard (*Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1143-1144 [58 Cal.Rptr.2d 152]).

On appeal, we independently review the administrative record under the same standard of review that governs the trial court. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375-1376 [43 Cal.Rptr.2d 170].)

3. *General and Specific Plans*

A general plan is a "charter for future development" within a city or county. (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317].) It embodies fundamental policy decisions to guide future growth and development. (*Citizens of Goleta*

*Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 571 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley II*).) Virtually all local decisions affecting land use and development must be consistent with the general plan. (*Id.* at p. 570; see, e.g., Gov. Code, §§ 65860, 65359.)

A city can adopt a specific plan to implement its general plan in a particular geographical area. (Gov. Code, § 65450.) A specific plan must be consistent with the general plan. (Gov. Code, § 65454.) Los Angeles currently is divided into 37 separate planning areas, each with its own specific community or district plan to implement the general plan. (L.A. Mun. Code, § 11.5.8, subd. (B).) Through the specific plans, the general plan, as amended by the GPF, will control land use decisions throughout the city.

### 4. *Mitigation of Transportation Impact*

 Petitioners contend there is no substantial evidence to support the city's finding that the mitigation measures identified in the final EIR will mitigate the significant effects on transportation. They base their contention on the statements in the TIMP that to implement the measures would require the cooperative efforts of various public agencies, together with the city, and that the city's portion of the cost will exceed its anticipated revenues. In light of those statements, they contend funding for the mitigation measures is highly speculative and the measures therefore are infeasible. The gravamen of Petitioners' contention is that there is no assurance that the mitigation measures will be implemented.[3]

CEQA does not expressly require a public agency to find that mitigation measures adopted for a project are feasible or that they will be implemented. Rather, CEQA requires the agency to find, based on substantial evidence, that the mitigation measures are "required in, or incorporated into, the project"; or that the measures are the responsibility of another agency and have been, or can and should be, adopted by the other agency; or that mitigation is infeasible and overriding considerations outweigh the significant environmental effects. (§ 21081; Guidelines, § 15091, subd. (b).) In

---

[3]Neither Petitioners nor the city addressed in their appellate briefs the significance of the city's findings that the cumulative effects on transportation are significant and unavoidable and that specific overriding considerations outweigh those effects. The former finding appears to conflict with the city's finding that the effects on transportation are significant and avoidable, as neither the EIR nor the Proposed Findings explain why the cumulative effects on transportation differ from the effects on transportation because they do not identify the source of the additional impacts apart from those allowed under the GPF. The city asserted at oral argument that the finding of overriding considerations as to cumulative effects does not relate to the significant, avoidable effects on transportation here at issue and that the city does not rely on the finding of overriding considerations to satisfy the required finding under section 21081 with respect to the significant, avoidable effects on transportation.

addition, the agency "shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures" (§ 21081.6, subd. (b))[4] and must adopt a monitoring program to ensure that the mitigation measures are implemented (§ 21081.6, subd. (a)). *The purpose of these requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded.* (See § 21002.1, subd. (b).)[5] We construe Petitioners' contention to be that the city failed to satisfy these requirements.

The city acknowledged in the TIMP that there was great uncertainty as to whether the mitigation measures would ever be funded or implemented. Although the city adopted the mitigation measures, it did not require that they be implemented as a condition of the development allowed under the GPF and made no provision to ensure that they will actually be implemented or "fully enforceable" (§ 21081.6, subd. (b)).[6] We therefore conclude that there is no substantial evidence in the record to support a finding that the mitigation measures have been "required in, or incorporated into" (§ 21081, subd. (a)(1)) the GPF in the manner contemplated by CEQA, and the city failed to provide that the mitigation measures would actually be implemented under the GPF (§ 21081.6, subd. (b)).[7]

*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 [280 Cal.Rptr. 478] (*SOCA*) involved the expansion of the city's convention center and construction of an office building. (*Id.* at p. 1015.) The EIR discussed several potential measures to mitigate the impacts on traffic and

---

[4]"A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures. Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, in the case of the adoption of a plan, policy, regulation, or other public project, by incorporating the mitigation measures into the plan, policy, regulation, or project design." (§ 21081.6, subd. (b).) In the context of this statute, to incorporate mitigation measures into a project means to amend the project so that the mitigation measures necessarily will be implemented, such as by reducing the scope of the project or requiring that mitigation measures be implemented as a condition of the project. (See Guidelines, § 15126.4, subd. (a)(1)(A), and former § 15126, subd. (c), both distinguishing mitigation measures proposed by the project proponent from those "required as conditions of approving the project.")

[5]"Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (§ 21002.1, subd. (b).)

[6]The city contends development will be allowed under the GPF only when the mitigation measures are funded, citing Policy 3.3.2. However, Policy 3.3.2 does not so state, as explained *ante*.

[7]The deficiency is in the GPF and the city's finding on mitigation of transportation impacts, not in the EIR. If the city remedies the deficiency by amending the GPF and making new findings as discussed *post*, it need not revise the EIR.

parking. (*Id.* at pp. 1020-1022.) The city did not adopt specific mitigation measures but committed to study the problem and prepare a transportation management plan. (*Id.* at pp. 1026-1030.) The court concluded that the city had "committed itself to mitigating the impacts" (*id.* at p. 1029) and stated that the EIR's consideration, discussion, and analysis of the mitigation measures supported the city's finding that the mitigation measures were "required in, or incorporated into" the project, under section 21081 (229 Cal.App.3d at pp. 1036-1037). However, the circumstances here do not support a finding that the city has made a binding commitment to implement the mitigation measures or, more appropriately, that they are incorporated into the project or required as a condition of project approval in a manner that will ensure their implementation.

### 5. *Water Resources*

Petitioners contend there is no substantial evidence to support the city's finding that the water supply will exceed demand in the year 2010. They cite various figures from the EIR and assert that the figures are inconsistent and do not support the city's finding.

The EIR projects an increase in the city's total water demand from 678,796 acre-feet per year (af/yr) in 1990 to 783,571 af/yr in 2010, utilizing the GPF's population and employment growth figures. It states that although the latter figure exceeds the projected "average water supply," the projected "total available water supply" based on full exploitation of the city's ground-water rights and the success of existing water reclamation programs will far exceed the projected demand. Thus, contrary to Petitioners' argument, the EIR projects both an increased water demand and an increased water supply. We see no inconsistency here.[8]

In any event, the city's findings do not rely on the projected water surplus. Rather, the findings state that although the department of water and power projects a water surplus in 2010, due to uncertainties that may reduce the water supply the city concludes that the growth permitted under the GPF will cause significant effects on the water supply requiring mitigation. The city then concludes that the mitigation measures incorporated into the GPF will avoid or substantially reduce the significant effects. Those measures include

---

[8]The EIR states, "The City's water conservation programs are estimated to reduce total projected water use in 2010 from 802,000 [af/yr] to 724,000 [af/yr]." Petitioners misconstrue this to mean that water demand in the baseline year of 1990 was 802,000 af/yr, although the EIR's 1990 water demand table cites a lower figure (678,796 af/yr). We construe the statement to mean that water demand in 2010 would be 802,000 af/yr but for the existing water conservation programs.

conservation programs and infrastructure improvements to reduce water consumption, measures to encourage the development of alternative water supplies through reclamation and desalinization, and other measures to reduce water consumption and increase supply. Petitioners do not discuss those mitigation measures or challenge the city's finding other than to claim that certain figures are inconsistent. We conclude that they have not shown error.

6. *Discussion of Alternatives*

Petitioners contend four of the five alternatives discussed in the EIR are infeasible and the sole remaining alternative does not constitute a reasonable range of alternatives. They do not challenge the sufficiency of the analysis of particular alternatives but only the range of alternatives presented.[9]

The city argues as a threshold issue that Petitioners failed to exhaust their administrative remedies because they did not challenge the feasibility or range of alternatives during the draft EIR public comment period. A party cannot sue to challenge a public agency's compliance with CEQA unless the alleged grounds for noncompliance were presented to the agency "by any person" during the public comment period or prior to the close of the public hearing on the project, if any. (§ 21177, subd. (a).) Thus, a party can litigate issues that were timely raised by others, but only if that party objected to the project approval on any ground during the public comment period or prior to the close of the public hearing on the project. (§ 21177, subd. (b); *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1119, 1121 [71 Cal.Rptr.2d 1].)

Another project opponent challenged the feasibility and range of alternatives, on essentially the same grounds as Petitioners now assert, in letters to the planning commission in February and April 1996, before the close of public hearings on the project in December 1996. Petitioners therefore are entitled to sue on those grounds as long as they objected to the project approval on any ground before December 1996. (§ 21177, subds. (a) & (b).)

---

[9]At oral argument, Petitioners challenged the sufficiency of the EIR's analysis of the required "no project" alternative. Although Petitioners and the city disagree as to which of the alternatives is the true "no project" alternative, Petitioners argued in their opening brief that one of the alternatives discussed in the EIR is a true "no project" alternative, and they did not challenge the sufficiency of the analysis of that alternative in their opening brief. Accordingly, we consider the issue waived. (*Barthelemy v. Chino Basin Mun. Water Dist.*, *supra*, 38 Cal.App.4th at p. 1613, fn. 2.)

Petitioners do not cite evidence in the record showing when they objected.[10] However, the city cites FHCA's written objections dated August 1994, during the predraft comment period, and acknowledges that both FHCA and CAP objected to the project before the city's final approval. We therefore conclude that Petitioners exhausted their administrative remedies and turn to the merits of their contention.

An EIR must discuss a reasonable range of potentially feasible alternatives to the proposed project.[11] (*Goleta Valley II, supra,* 52 Cal.3d at pp. 564-566; §§ 21002, 21002.1, subd. (a), 21100, subd. (b)(4).) The discussion should focus on alternatives that could substantially reduce or avoid one or more of the significant environmental effects while still serving the project's fundamental objectives. (*Goleta Valley II,* at p. 566; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 378 [7 Cal.Rptr.2d 307].) An EIR need not consider every conceivable alternative but must consider a range of alternatives sufficient to permit the agency to evaluate the project and make an informed decision, and to meaningfully inform the public. (Guidelines, § 15151; *Laurel Heights I, supra,* 47 Cal.3d at pp. 406-407; *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 750-751 [202 Cal.Rptr. 423].) Under the "rule of reason," an EIR's discussion of alternatives is adequate if it provides sufficient information to compare the project with a reasonable choice of alternatives. (*Goleta Valley II,* at p. 565; *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 [185 Cal.Rptr. 41]; *Residents Ad Hoc Stadium Com. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 287 [152 Cal.Rptr. 585].)

The alternatives presented in the EIR include (1) "No Growth," a moratorium on development; (2) "Community Plan Buildout," continued development governed by the existing community plans; (3) "Alternative A1," concentration of development near proposed transit stations, assuming the construction of a comprehensive transit network based on the former Metropolitan Transit Authority (MTA) 30-year plan; (4) "2010 Market Buildout," continued development governed by the existing community plans but

---

[10]Petitioners apparently contend the exhaustion requirement does not apply because the city must consider objections to the GPF even if they are presented after the public comment period. They cite *Goleta Valley II, supra,* 52 Cal.3d at pages 568-569, for the proposition that a public agency must consider alternatives that are proposed for the first time after the public comment period and argue that the rule applies to any objection raised by any party. The petitioner in *Goleta Valley II* had objected to the project during the public comment period but identified other alternatives after the public comment period (*id.* at pp. 561-562), so the opinion does not support the proposition that a party who did not timely object to the project can object at any time.

[11]" 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.)

limited by certain Southern California Association of Governments (SCAG) projections; and (5) "Theoretical Buildout," development governed by the GPF but without its land use policies for managed development. Petitioners do not challenge the feasibility of the 2010 Market Buildout alternative.

Petitioners argue in a conclusory fashion that the No Growth alternative is illegal, impracticable, unreasonable, and therefore infeasible and that the complete transit system construction under Alternative A1 would be impossible to achieve. They cite *Goleta Valley II*, *supra*, 52 Cal.3d at page 575, in which the court upheld the public agency's determination that an alternative was infeasible and therefore need not be considered. Unlike a public agency whose determination is upheld if there is substantial evidence to support it (*id.* at pp. 566-567), Petitioners must show that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives. Since they cite no evidence or meaningful legal authority and offer no reasoned argument to so demonstrate, we reject their challenges to these alternatives.

We need not address Petitioners' challenges to the other alternatives. As a whole, the range of alternatives appears to provide a meaningful basis for comparison with the project and is objectively reasonable.

### 7. *Population Growth*

Petitioners contend the GPF would result in population growth beyond its projections due to the employment growth projected in the GPF. They contend the EIR does not address the environmental effects of that additional population growth.

SCAG projected that the ratio of jobs to population would decrease by the year 2010. The GPF relies on SCAG's projected population growth but doubles SCAG's projected employment growth in order to maintain the current employment ratio. Employment growth is one of the fundamental objectives of the GPF.

An EIR must analyze the growth-inducing impact of a project, including reasonably foreseeable consequences but not speculative effects. (§ 21100, subd. (b)(5); see *Laurel Heights I*, *supra*, 47 Cal.3d at p. 396.) The EIR discusses the GPF's environmental impacts in several areas based on the GPF's population and employment projections and also discusses some of the growth-inducing impacts. Petitioners have not shown that the GPF necessarily would result in population growth beyond its projections or that its population projections are manifestly unreasonable. We conclude that they have not shown error.

## 8. *Recirculation*

The city acknowledged at oral argument that it has complied with the trial court's order to circulate the TIMP, so the issue of whether the trial court erred by ordering the city to circulate the TIMP is moot and we will not address it.

## 9. *Remedy for CEQA Violation*

We must consider the appropriate remedy for the city's noncompliance with CEQA as to mitigation of the significant effects on transportation. When a court finds that a public agency failed to comply with CEQA, it must do one or more of the following: (1) mandate that the agency vacate the determination, finding, or decision in whole or in part; (2) if the court finds that a specific project activity will prejudice the consideration or implementation of mitigation measures or project alternatives and could result in an adverse physical environmental change, mandate that the agency and any real party in interest suspend specific activity until the agency complies with CEQA; (3) mandate that the agency take specific action necessary to comply with CEQA. (§ 21168.9, subd. (a).) The court must specify what action by the agency is necessary to comply with CEQA (§ 21168.9, subd. (b)) but cannot direct the agency to exercise its discretion in a particular way (§ 21168.9, subd. (c)).

Petitioners have not requested a particular remedy on appeal, and the trial court did not address the issue. On this record, it would be inappropriate for this court to order a specific remedy other than to vacate the city's approval of the GPF and its finding on mitigation of transportation impacts, but not its certification of the EIR. We find no fault with the EIR itself, but only with the GPF and the city's finding on transportation impacts. The trial court retains jurisdiction in this matter to order other remedies, if appropriate. (§ 21168.9, subd. (b).) The city may comply with CEQA by amending the GPF so that effective mitigation measures are required as a condition of the development allowed under the GPF or by restricting the scope of development and then making a finding under section 21081, subdivision (a)(1), or by making a finding of overriding considerations as to the significant effects on transportation.[12]

---

[12]If the city amends the GPF in a manner that will have a different or more severe effect on the environment, other than by making the mitigation measures a condition of development, it must revise and recirculate the EIR. (§ 21092.1; *Laurel Heights II, supra,* 6 Cal.4th at pp. 1129-1130.)

## DISPOSITION

We reverse the judgment denying the petition for writ of mandate and remand the matter to the trial court with directions to grant the petition for a peremptory writ of mandate vacating the city's approval of the GPF and specifying what actions by the city are necessary to comply with CEQA as stated in this opinion. Petitioners shall recover their costs on appeal.

Kitching, J., and Aldrich, J., concurred.