Filed 9/5/19; Certified for Partial Pub. 10/3/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| CHICO ADVOCATES FOR A RESPONSIBLE ECONOMY, | C087142 |
| Plaintiff and Appellant, | (Super. Ct. No. 16CV02994) |
| v. | |
| CITY OF CHICO, | |
| Defendant and Respondent; | |
| WALMART INC., | |
| Real Party in Interest and Respondent. | |

This appeal involves a challenge under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] to a project proposing to expand an

---

[1] Further undesignated statutory references are to the Public Resources Code.

existing Walmart store by approximately 64,000 square feet (the Project). Years earlier, Walmart Stores, Inc. (Walmart), had proposed a larger expansion project that would have increased the size of the store by approximately 98,000 square feet. In 2009, the City of Chico (City) declined to approve that project.

In 2015, Walmart returned to the City seeking approval of the current Project. After preparing a new environmental impact report (EIR), which showed the Project would have a significant and unavoidable traffic impact, the City certified the EIR and approved the Project. The City also adopted a statement of overriding considerations, concluding that the benefits of the Project outweighed its one unavoidable environmental impact.

Plaintiff Chico Advocates for a Responsible Economy (CARE) filed a petition for writ of mandate challenging the City's environmental review and approval of the Project, but the trial court denied the petition. CARE now appeals the judgment denying its petition, arguing the trial court erred in denying the petition because (1) the EIR failed to adequately evaluate the Project's urban decay impacts and (2) the City's statement of overriding considerations is deficient. We will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*The Project*

The Project approved by the City will expand an existing Walmart store in Chico, California. The Project is located within a regional retail center that borders the east side of State Route 99, which includes the Chico Mall as well as numerous national chain retail stores. Less than one mile west of the Project, on the other side of State Route 99, is another retail shopping center, which includes a FoodMaxx discount supermarket. A number of other discount food shopping options also are clustered in the general area near the Project.

The existing Walmart store is 131,302 square feet in total area. The Project will expand the store by approximately 64,000 square feet, add an eight-pump gas station, and

2

create two new outparcels (totaling 5.2 acres) for future commercial development. Most of the expanded space—about 49,000 square feet—will be used for grocery-related sales and support. The remainder of the new space will be used for general merchandise sales and storage.

In 2009, the City denied an earlier proposal by Walmart to expand the store by approximately 97,556 square feet, together with a 12-pump gas station and one outparcel (totaling 2.42 acres). An EIR prepared in connection with the first proposal showed that even after implementation of feasible mitigation measures the project would have significant and unavoidable environmental impacts. In denying the earlier proposal, the City declined to adopt a statement of overriding considerations after finding that the benefits of that larger proposed expansion project did not outweigh its significant and unavoidable environmental impacts.

*The EIR's urban decay analysis*

In 2015, Walmart returned with a proposal for the current Project. To comply with CEQA, the City prepared and released for public comment a draft EIR, analyzing an expansion area of 66,500 square feet, approximately three percent larger than the actual proposal.

The EIR includes, among other things, a robust 43-page urban decay analysis, which is supported by a 123-page study prepared by ALH Urban & Regional Economics (ALH). The purpose of the study is to assess the economic impact of the Project and examine whether there is sufficient market demand to support the Project without affecting existing retailers so severely as to cause or contribute to urban decay. The study defines "urban decay" to mean, "among other characteristics, visible symptoms of physical deterioration . . . that is caused by a downward spiral of business closures and long term vacancies . . . . [and] . . . so prevalent, substantial, and lasting for a significant

3

period of time that it impairs the proper utilization of the properties and structures, and the health, safety, and welfare of the surrounding community."[2]  (Fn. omitted.)

The study estimates the potential economic impacts of the Project on retailers in the Project's market area, primarily in the form of diverted sales.  The study then evaluates the extent to which the Project may cause or contribute to urban decay through a downward spiral of store closures attributable to the diverted retail sales.

To complete the study, ALH engaged in an extensive scope of work.  Among other things, it (1) identified the Project's market area; (2) estimated the Project's net retail sales; (3) analyzed existing market conditions; (4) analyzed existing retail demand; (5) estimated the additional retail demand from forecasted population growth; (6) evaluated the Project's competitive effects on existing retailers; (7) identified other planned retail projects; and (8) assessed the extent to which the Project and other projects might contribute to urban decay.

The results of the study indicate that, net of new growth, the Project would have a negligible impact on sales of competing retailers ranging from 0.8 to 3.1 percent, which is within the range of normal market fluctuations and is not believed to be sufficient to cause existing stores to close.[3]  Thus, the EIR concludes that the Project alone would not cause the type of severe economic effects that could potentially lead to urban decay.

With respect to the Project's cumulative impacts, the study shows that the Project, combined with other planned retail projects in the market area, could induce the closure of one existing, full-service grocery store.  However, given the size of the retail base, the

---

[2]  According to the study, manifestations of urban decay include such visible conditions as plywood-boarded windows and doors, extensive graffiti, dumping of refuse on site, overturned dumpsters, dead trees and shrubbery, lack of building maintenance, homeless encampments, and unsightly and dilapidated fencing.

[3]  The analysis employs a three percent sales buffer to account for normal annual market fluctuations.

study concludes the cumulative impacts would only increase the City's market vacancy rate by about one percent, from 4.4 to 5.4 percent, which is "well within the range of a robust, healthy commercial retail sector."  The EIR also explains that the Chico market area has a strong history of "backfilling" retail space vacancies within a reasonable time, precluding prolonged vacancies that could lead to urban decay.  Further, even if some sites were to experience prolonged vacancies, the EIR concludes that the vacancies would not devolve into deterioration or decay because Chico has a strong retail market, existing retail vacancies are well-maintained, and the City has effective regulations to prevent urban decay and blight.  Thus, the EIR concludes that while economic impacts are likely, the Project's potential cumulative economic impacts likely would not be sufficient to cause urban decay.

*The final EIR and approval of the Project*

In September 2016, the City released its final EIR.  It contained revisions to the draft EIR and written responses to comments received on the draft EIR, including comments relating to potential store closures and the City's alleged failure to address the "defects of the past project" rejected in 2009.  The final EIR identifies mitigation measures to reduce the Project's potentially significant environmental impacts, but concludes that even with mitigation, the Project will have a significant and unavoidable impact on transportation because it will cause a segment of State Route 99 to operate at an unacceptable level of service during peak hour conditions.

In October 2016, the City's planning commission held a public hearing and, consistent with the staff recommendation, voted to certify the EIR and approve the Project with a statement of overriding considerations.  CARE appealed the decision to the city council.

On November 15, 2016, the city council held a public hearing to consider CARE's appeal.  At the hearing, CARE challenged the EIR's urban decay analysis and the proposed statement of overriding considerations, supporting its last-minute arguments

5

with a report prepared by its "retail expert," Area Research Associates (ARA). Although no response was required, counsel for Walmart and City staff briefly responded to CARE's comments.

At the conclusion of the hearing, the city council voted to deny the appeal, certify the EIR, and approve the Project. The city council also adopted a statement of overriding considerations for the significant and unavoidable transportation impact to State Route 99. In doing so, the City found that the Project would provide 10 significant benefits, each of which constitutes a separate and independent ground to support a finding that the benefits of the Project outweigh the Project's single significant and unavoidable environmental impact.

*The trial court's decision*

In December 2016, CARE filed a petition for writ of mandate challenging the adequacy of the Project's EIR and the City's statement of overriding considerations. Walmart and the City opposed the petition. Following briefing, the trial court heard argument and then issued a detailed statement of decision rejecting each of CARE's arguments. In February 2018, the court entered judgment for the City and Walmart. This appeal followed.

DISCUSSION

*Alleged CEQA violations*

A.    *Standard of review*

In a mandate proceeding to review an agency's decision for compliance with CEQA, the court reviews the administrative record to determine whether the agency abused its discretion. Abuse of discretion is shown if the agency has not proceeded in the manner required by law, or the determination is not supported by substantial evidence. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1105.)

6

In evaluating an EIR for compliance with CEQA, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard Area Citizens*).) Where the alleged defect is that the agency has failed to proceed in the manner required by law, the court determines de novo whether the agency has employed the correct procedures, scrupulously enforcing all legislatively mandated requirements. (*Ibid*.)

Where the alleged defect is that the agency's factual conclusions are not supported by substantial evidence, the reviewing court must accord deference to the agency's factual conclusions. (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435.) We must indulge all reasonable inferences from the evidence that would support the agency's finding and resolve all conflicts in the evidence in favor of the agency's decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 (*Western States Petroleum*).) "[T]he reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard Area Citizens, supra*, at p. 435.)

The power of the appellate court " 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [finding].' " (*Western States Petroleum, supra,* 9 Cal.4th at p. 571.) We may reverse an agency's determination only if it is not supported by "enough relevant information and reasonable inferences from this information that a fair argument can be made to support [the] conclusion." (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15384, subd (a) [CEQA's regulatory guidelines; hereafter "CEQA Guidelines"]; *Center for Biological Diversity v. Department of Forestry & Fire Protection* (2014) 232

Cal.App.4th 931, 941 [the standard is satisfied if the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached].)

Regardless of what is alleged, an EIR approved by a governmental agency is presumed legally adequate, and the party challenging the EIR has the burden of showing otherwise. (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 157-158.)

B.      *Urban decay analysis*

CARE argues that the EIR's urban decay analysis is inadequate for two reasons. First, the EIR adopted an "unnaturally constrained definition of 'urban decay' " and therefore failed to treat the loss of "close and convenient shopping" as a significant environmental impact. Second, due to flaws in its methodology, the EIR's urban decay findings are not supported by substantial evidence. Neither claim has merit.

1.      Failure to analyze loss of close and convenient shopping

We first address CARE's claim that the EIR violates CEQA because it fails to treat the "likely elimination of close and convenient shopping" as a significant environmental impact.

In *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 513, the Supreme Court addressed what standard of review to apply to a claim challenging the adequacy of an EIR's discussion of environmental impacts. The court recognized that such claims do not always fit neatly within CEQA's procedural/factual paradigm. (*Id.* at p. 513.) The Supreme Court observed that there are "instances where the agency's discussion of significant project impacts may implicate a factual question that makes substantial evidence review appropriate," such as an agency's decision to use a particular methodology. (*Id*. at p. 514.) "But whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question." (*Ibid*.) Where the ultimate inquiry is whether an EIR omits material necessary to reasoned decisionmaking and informed public participation,

8

the inquiry is predominantly legal and, "[a]s such, it is generally subject to independent review." (*Id.* at p. 516; see also *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 271.)

Here, CARE argues the City's EIR violates CEQA because it fails to analyze the Project's likely elimination of "close and convenient shopping" as a significant environmental impact.[4] This argument presents the predominantly legal question of whether the EIR includes enough detail "to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 405.) Applying independent review to this question, we conclude that CARE's argument lacks merit—the City did not violate CEQA because the potential loss of close and convenient shopping is not an environmental issue that must be reviewed under CEQA.

CEQA is concerned with physical changes in the environment. (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019; CEQA Guidelines, § 15358, subd. (b); see also §§ 21060.5, 21065.) CEQA defines a significant effect on the environment to mean "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals,

---

[4] CARE's argument, based on the Project's "likely elimination of close and convenient shopping," is an apparent reference to the "nearby" FoodMaxx. According to CARE, the "EIR concedes [this] is the most likely grocer to close should the Project be completed," and that loss of this store would cause a "significant physical impact" to the community. We note that the EIR identified the two "most susceptible" stores as a Raley's and a Save Mart, both located on W. East Avenue. But even if CARE was correct that FoodMaxx is the retailer most at risk, the premise of CARE's argument is flawed. If the Project causes the *nearest* competitor to close—a competitor located less than a mile west of the Project—then the Project will not have deprived the neighborhood of "close and convenient shopping." It simply will have substituted one "close and convenient" shopping option for another.

9

flora, fauna, ambient noise, and objects of historic or aesthetic significance." (CEQA Guidelines, § 15382; see also § 21068.) Social and economic changes must be addressed under CEQA if they will cause changes in the physical environment. (CEQA Guidelines, § 15131.) But an economic or social change by itself is not considered a significant effect on the environment. (CEQA Guidelines, §§ 15064, subd. (e), 15131, 15382; *Friends of Davis, supra,* at p. 1019.)

CARE argues that the loss of close and convenient shopping is an environmental impact because it "decreases the quality of life in a community." That conclusion does not follow. Although the loss of close and convenient shopping could impact some Chico residents psychologically and socially, such impacts are not, by themselves, environmental impacts. (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 685 (*Joshua Tree*) [fact that new big-box retail may drive other retailers out of business is not an environmental impact covered by CEQA]; *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 446 ["social, economic and business competition concerns are not relevant to CEQA analysis unless it is demonstrated that those concerns will have a significant effect on the physical environment"]; *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 576-582 [CEQA does not require analysis of psychological and social impacts of negative impacts on city's community character].)

CARE's reliance on *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 (*Bakersfield*) is misplaced. Unlike here, that case involved a complete failure to consider urban decay impacts. In *Bakersfield,* after EIR's were prepared for the development of two retail shopping centers located about three miles apart, an environmental group challenged the EIR's on the basis that they did not consider potential urban decay impacts. (*Id*. at pp. 1193-1194, 1204.) The appellate court agreed the EIR's were deficient because, despite evidence that the projects could cause a downward spiral of store closures and consequent long-term vacancies, the EIR's

10

omitted any meaningful consideration of whether the projects could cause or contribute to urban decay.  (*Id.* at pp. 1207-1208, 1212.)

The court in *Bakersfield* did not hold that the absence of close and convenient shopping, by itself, constitutes an environmental impact.[5]  It merely held that CEQA, under some circumstances, requires urban decay to be considered as an indirect environmental effect of a proposed project.  (*Bakersfield, supra*, 124 Cal.App.4th at p. 1207.)  And it offered the absence of close and convenient shopping as one example of the types of social problems that could result when urban decay occurs.  (*Id.* at p. 1220.)

CARE's attack on the City's definition of "urban decay" is similarly misguided. For purposes of its urban decay analysis, the EIR defines urban decay as, "among other characteristics, visible symptoms of physical deterioration that invite vandalism, loitering, and graffiti that is caused by a downward spiral of business closures and long-term vacancies.  The physical deterioration to properties or structures is so prevalent, substantial, and lasting for a significant period of time that it impairs the proper utilization of the properties and structures, and the health, safety, and welfare of the surrounding community."  As this definition shows, the EIR did not limit its analysis to long-term vacancies and graffiti, but considered these among other visible symptoms of physical deterioration.

The City explained and supported its definition of urban decay with substantial evidence,[6] and the City's definition is consistent with definitions of urban decay

---

[5]  While we do not foreclose the possibility that the "absence of close and convenient shopping" could in some circumstances be related to general deterioration or decay, there is nothing to support CARE's argument that the absence of close and convenient shopping is, by itself, a physical environmental impact.

[6]  An agency has discretion to develop thresholds for assessing the significance of a project's impacts and an agency's choice of a significance threshold will be upheld if supported by substantial evidence.  (*East Sacramento Partnerships for a Livable City v.*

approved in other cases. (*Bakersfield, supra,* 124 Cal.App.4th at pp. 1204, 1209, 1212 [a chain reaction of store closures and long-term vacancies that culminates in physical effects associated with blight-like conditions, such as graffiti and other unsightly conditions]; see also *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1183-1186.) Indeed, the City's definition is nearly identical to the definition upheld in *Joshua Tree*, *supra*, 1 Cal.App.5th at page 685.

We conclude that the City did not violate CEQA by failing to analyze the loss of "close and convenient shopping" as a potential environmental impact.

        2.      The EIR's methodology is supported by substantial evidence

CARE also argues ALH's study was flawed and therefore the EIR's conclusions are not supported by substantial evidence. We disagree and hold that CARE has failed to meet its burden to show the City's urban decay analysis is inadequate.

The City's EIR includes a 43-page section analyzing the Project's potential to contribute to urban decay. The EIR's analysis is supported by a 123-page study prepared by experts at ALH. The purpose of the study is to estimate the potential economic impacts of the Project on retailers in the Project's market area and evaluate the extent to which completion of the Project may contribute to potential store closures and urban decay. The study concludes that while the Project could contribute to the closure of one existing full-service grocery store, the Project's impacts would not be sufficient to cause urban decay.

In reviewing challenges that are predominantly disputes over factual findings and conclusions reached in an EIR, the court must uphold the EIR if there is any substantial evidence in the record to support the agency's decisions. (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 435.) Challenges to the scope of an EIR's analysis of a topic, the

---

*City of Sacramento* (2016) 5 Cal.App.5th 281, 300; *Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 206 (*Mission Bay*).)

methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied, present questions of fact, and so we must uphold the EIR if there is any substantial evidence to support the agency's reasons for proceeding in the manner that it did. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259; *Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 581; see also *Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26.)

CARE alleges three "material flaws" with the study's methodology. First, CARE argues that the study relies on incorrect assumptions about the Project's anticipated grocery sales. In particular, CARE argues that the study improperly uses a storewide average of sales per square foot to estimate grocery sales per square foot.[7] CARE argues that grocery area sales are, on average, 62 percent higher than the storewide average.[8] As the majority of the new space in the Chico store will be devoted to grocery, CARE argues

---

[7] The study estimates the retail sales that will be generated by the Project using information from Walmart's annual form 10-K Securities and Exchange Commission (SEC) reports to calculate average sales per square foot for its stores for the 10 most recent fiscal years ($484/square foot). The study then estimates the Project's net retail sales by multiplying the average sales per square foot by the amount of new square footage that will be generated by the Project. To determine the portion of sales attributable to a particular retail category, the study allocates the Project's total sales proportionately based on the corresponding distribution of anticipated net new sales space dedicated to each retail category (e.g., eight percent general merchandise sales).

[8] CARE obtains this percentage based on Walmart's 2015 SEC filing, which, it argues, shows that grocery sales account for 56 percent of Walmart's revenue, but only 35.5 percent of its floor space. As support, CARE cites to the report of its retail expert, ARA. The ARA report concludes that grocery accounts for "34.5% of the total floor space within a typical store," based on a diagram of a typical "supercenter" store. However, as the City's EIR explains, Walmart operates three different types of store formats: supercenters, discount stores, and neighborhood markets. Thus, even if grocery accounts for 34.5 percent of a typical supercenter store, this does not necessarily mean that grocery accounts for 34.5 percent of Walmart's total floor space, as CARE argues.

13

the City's study significantly understates the economic impact of the Project on competing grocers in the relevant market area.

Second, CARE argues that the study underestimates the Project's impact on Chico area stores because it assumes shoppers from the Town of Paradise will patronize the store. CARE asserts that shoppers in Paradise are more likely to be served by existing and future grocery retailers in their own town.

Third, CARE argues that the study erroneously assumes the economic impact of the Project will be spread among existing stores in the market area, rather than concentrated on the nearest competitor, FoodMaxx. CARE argues that the study ignores the "strong likelihood" that the Project could cause FoodMaxx to close.

Walmart responds that all of CARE's criticisms amount to nothing more than a disagreement among experts regarding the proper methodology and underlying data for the EIR's urban decay analysis. We agree.

As explained above, challenges to the scope of an EIR's analysis, the methodology used, or the reliability or accuracy of the data underlying an analysis, must be rejected unless the agency's reasons for proceeding as it did are clearly inadequate or unsupported. (See *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 426.) The issue for us is " 'not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the [agency's] finding[s] . . . .' [Citation.]" (*Id*. at p. 425.)

When an agency is faced with conflicting evidence on an issue, it is permitted to give more weight to some of the evidence and to favor the opinions of some experts over others. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 (*Association of Irritated Residents*); *Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413; *Browning-Ferris Industries v. City Council* (1986) 181

14

Cal.App.3d 852, 863 (*Browning-Ferris*).) Mere "[d]isagreement among experts does not make an EIR inadequate. " (*Browning-Ferris*, at p. 862.)

While CARE may have preferred the City approach its urban decay analysis differently, we are not persuaded that the City's approach renders the analysis clearly inadequate or unsupported. The identified "flaws" with the EIR's methodology amount to nothing more than differences of opinion about how the Project's expected grocery sales should be estimated, how the Project's market area should be defined, and which competitors are most susceptible to impacts from the Project.[9] The choice of one approach over the other does not render the City's EIR unreliable.[10] In short, CARE's challenges fail under the substantial evidence test.

### C.     *Statement of overriding considerations*

When determining whether to approve a proposed project, a lead agency must balance the economic, legal, social, technological, or other benefits of the project against its unavoidable environmental risks. (CEQA Guidelines, § 15093, subd. (a).) If the agency finds that the project's benefits outweigh its unavoidable adverse environmental effects, the agency may approve the project with a "statement of overriding

---

[9] Usually, in case of disagreement among experts, the EIR should summarize the main points of disagreement and explain the agency's reasons for accepting one set of experts over the other. (CEQA Guidelines, § 15151; *Association of Irritated Residents, supra,* 107 Cal.App.4th at p. 1391.) In this case, however, CARE's arguments are based on evidence submitted on the eve of the city council hearing, months after the close of the public comment period. CEQA does not require an agency to respond to comments that are received after close of the designated public review period. (*Association of Irritated Residents, supra,* 107 Cal.App.4th at p. 1395, fn. 4; *Browning-Ferris, supra,* 181 Cal.App.3d at p. 862; CEQA Guidelines, § 15207.)

[10] While CARE argues its analysis shows the Project will lead to additional store closures, CARE has not attempted to show how the additional store closures would lead to urban decay. Store closures, by themselves, do not amount to urban decay. (See *Joshua Tree, supra*, 1 Cal.App.5th at p. 685.)

15

considerations" stating in writing the specific reasons for its decision to allow the adverse effects to occur. (CEQA Guidelines, §§ 15043, 15093; § 21081; *Mission Bay, supra*, 6 Cal.App.5th at p. 183; *County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 100-101.)

Here, the City adopted a statement of overriding considerations after the EIR found that the Project would have a single significant and unavoidable impact relating to potential traffic delays on State Route 99. In its statement of overriding considerations, the City explains that implementation of the Project would provide 10 social and economic benefits that, individually and collectively, outweigh the Project's lone significant and unavoidable transportation impact.[11]

CARE argues that the City's statement of overriding considerations is inadequate because it fails to reconcile the City's approval of the Project with the City's 2009 denial of the previous expansion proposal. CARE reasons that the City, in denying the previous proposal, expressly found that the benefits of the project did not justify adoption of a statement of overriding considerations. CARE asserts the City denied the previous proposal because it was concerned about a potential loss of jobs, oversaturation of the discount grocery market, concentration of discount groceries in the far southeast corner of town, and possible urban decay. CARE contends these concerns remain valid today. Thus, CARE argues the City has a duty under *Topanga Assn. for a Scenic Community v.*

---

[11] The identified Project benefits are: (1) developing an underutilized site; (2) strengthening the regional retail market; (3) reinforcing the City's status as a regional retail node; (4) creating up to 240 new jobs, plus temporary construction jobs; (5) expanding an existing regional retail use close to State Route 99 to better serve the retail demands of the market area; (6) generating new property, sales, and fuel tax revenue; (7) promoting economic growth; (8) enhancing bicycle and pedestrian circulation; (9) improving the overall visual appearance of the area by removing unsightly billboards and providing high-quality contemporary architecture and landscaping; and (10) meeting the City's unmet retail demands.

16

*County of Los Angeles* (1974) 11 Cal.3d 506 (*Topanga*) to address these concerns in its statement of overriding considerations and explain why its "prior findings are no longer apt." We disagree that *Topanga* imposes any such duty.[12]

In *Topanga*, our Supreme Court considered whether a local agency must render findings to support a decision to grant a variance even if there is no local ordinance commanding such findings. (*Topanga, supra,* 11 Cal.3d at p. 510.) The court broadly held that findings are required whenever an administrative agency renders an adjudicatory decision subject to judicial review. (*Id*. at pp. 515-516.) The Supreme Court explained that, among other functions, a findings requirement serves to minimize the likelihood that the agency will randomly leap from evidence to conclusions. (*Id.* at p. 516.) In addition, findings enable the reviewing court to trace the agency's mode of analysis and enable the parties to determine whether and on what basis they should seek review. (*Id*. at pp. 516-517.) Under *Topanga*, when an agency renders an adjudicative decision, it must set forth findings "to bridge the analytic gap between the raw evidence and ultimate decision and order." (*Id*. at p. 515.)

---

[12] In a heading in its opening brief, CARE argues that the "Statement of Overriding Considerations ignores prior conflicting findings related to the expansion and therefore is not supported by substantial evidence." However, aside from citing the general legal principle that a statement of overriding considerations must be supported by substantial evidence, CARE failed to develop this argument with reasoned analysis or citations to the record. Thus, apart from the *Topanga* issue discussed below, we conclude that CARE has forfeited any challenge to the sufficiency of the evidence supporting the City's statement of overriding considerations. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785; see also *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 [it is the plaintiff's burden to show there is no substantial evidence to support the agency's findings].) For similar reasons, we decline to consider the argument, raised for the first time in CARE's reply brief, that there is no substantial evidence to support the City's response to comments about the previous proposal. (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830 [a contention made for the first time in a reply brief may be disregarded].)

17

*Topanga* applies when a lead agency adopts the mitigation and feasibility findings required under CEQA Guidelines section 15091. (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 496.) It is a fundamental policy of CEQA that public agencies should not approve projects if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects. (§ 21002; CEQA Guidelines, § 15021.) To effectuate this policy, before approving a project, CEQA requires a public agency to make certain specified findings attesting to its consideration of feasible alternatives or feasible mitigation measures available which would substantially lessen a project's significant environmental effects. (§ 21081; CEQA Guidelines, § 15091.) The CEQA Guidelines require feasibility/mitigation findings for each significant environmental effect, and those findings must bridge the analytic gap between the raw evidence and the ultimate decision. (*Mira Mar Mobile, supra*, at p. 496.)

CARE argues that an agency's statement of overriding considerations should be treated the same as the feasibility/mitigation findings required under CEQA Guidelines section 15091. Although we agree that a statement of overriding considerations is similar to such findings, we are not persuaded they must be treated the same.

A decision to approve a project despite its significant environmental effects is a *policy* decision. (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1223, overruled on other grounds in *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 529.) Unlike the findings required under CEQA Guidelines section 15091, which focus on the feasibility of specific proposed alternatives or mitigation measures, a statement of overriding considerations focuses on the "larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like." (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist*. (1994) 24 Cal.App.4th 826, 847.) While a statement of overriding considerations must be supported by substantial evidence, courts typically

18

defer to the agency's decision to adopt a statement of overriding considerations because it "lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 368; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2015) Project Approval and Findings, § 17.34; CEQA Guidelines, § 15021, subd. (d) [a statement of overriding considerations "reflect[s] the ultimate balancing of competing public objectives when the agency decides to approve a project that will cause one or more significant effects on the environment"].)

Under the CEQA Guidelines, when an agency adopts a statement of overriding considerations, the agency must include a statement of "specific reasons" for that policy decision. (CEQA Guidelines, § 15093, subd. (b).) The reasons for the agency's decision must be supported by substantial evidence, but CARE cites no authority, and we are aware of none, holding that a statement of overriding considerations must describe in detail the weight accorded to the various aspects of the agency's balancing of competing public objectives.[13] Nor are we aware of any authority that would require an agency to

---

[13] Even *Topanga* does not require this level of detail. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1362 [findings are required to state only ultimate, not evidentiary, facts].) To satisfy *Topanga*, administrative findings need not be as precise or formal as would be required of a court. (*McMillan v. American General Finance Corp.* (1976) 60 Cal.App.3d 175, 183.) Administrative findings are deemed adequate if they apprise interested parties and the court of the bases for the administrative action and enable the parties to determine whether and on what bases to seek review. (*Topanga, supra*, 11 Cal.3d at p. 514; *McMillan*, at p. 185; *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596.) The City's statement of overriding considerations meets this standard because it describes the specific reasons why the City determined the benefits of this Project outweigh the significant and unavoidable traffic impact.

make findings reconciling an allegedly "conflicting" policy determination relating to an earlier, but materially different, proposal.

Here, the City made the required findings for each identified significant effect, and included a statement of reasons why it determined the Project's benefits made the Project's unavoidable adverse environmental effect " 'acceptable.' " (CEQA Guidelines, §§ 15091, 15093.) Nothing more was required. (See *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 983; *Sierra Club v. Contra Costa County, supra*, 10 Cal.App.4th at p. 1223; *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 356-357; see also *The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 623-625.)

In any event, in response to public comments relating to the previous project, the City's EIR explained why the findings and conclusions from the previous EIR had "little to no value" for the current CEQA evaluation. In particular, the EIR explained that the 2009 proposal was a different and significantly larger project (97,556 square feet vs. 66,500 square feet), which had different environmental impacts and led to different benefits and burdens. In addition, due to the passage of time since the 2009 decision, "many changes have occurred to baseline conditions, [the] regulatory framework, and analytical methods that render many of the conclusions from the previous CEQA analysis outdated." Thus, the EIR concludes that the City's 2009 decision—on a different project—is not relevant to the environmental analysis of the current Project. CARE has failed to meet its burden to show that the City's explanation is clearly erroneous or not supported by substantial evidence.

CARE's argument is tantamount to a policy disagreement about whether the benefits of this Project outweigh its costs. In 2009, the City determined that the benefits of a previous (and significantly larger) proposal did not outweigh its environmental costs. Here, under different circumstances and with different decisionmakers, the City reached a different conclusion. It is not our task to review the wisdom of the Project or to pass

20

upon the correctness of the City's policy decision. (*Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 259; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1269 [improper to "arrogate to ourselves a policy decision which is properly the mandate of the City"].)  We reject CARE's claim that the City's statement of overriding considerations is inadequate under CEQA.

## DISPOSITION

The judgment is affirmed.  Walmart and the City are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


            KRAUSE            , J.



We concur:



     HULL            , Acting P. J.



     MURRAY        , J.


21

Filed 10/3/19

CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| CHICO ADVOCATES FOR A RESPONSIBLE ECONOMY,<br><br>       Plaintiff and Appellant,<br><br>  v.<br><br>CITY OF CHICO,<br><br>       Defendant and Respondent;<br><br><br>WALMART INC.,<br><br>       Real Party in Interest and Respondent. | C087142<br><br>(Super. Ct. No. 16CV02994)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on September 5, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the

1

opinion should be published in the Official Reports, with the exception of section C of the discussion, and it is so ordered.

## EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Butte County, Stephen E. Benson, Judge. Affirmed.

Shore, McKinley, Conger & Jolley, Brett S. Jolley, and Becky R. Diel for Plaintiff and Appellant.

Alvarez-Glasman & Colvin, Stephen T. Owens, and Christy M. Garcia for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Arthur J. Friedman, and Alexander L. Merritt for Real Party in Interest and Respondent.

BY THE COURT:

    HULL    , Acting P. J.

    MURRAY    , J.

    KRAUSE    , J.

2