Filed 7/24/24  Westside L.A. Neighbors Network v. City of L.A. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WESTSIDE LOS ANGELES NEIGHBORS NETWORK,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>Defendant and Respondent. | B320547<br><br>Los Angeles County<br>Super. Ct. No. BS174110 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Channel Law Group, Jamie T. Hall and Julian K. Quattlebaum for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Denise C. Mills, Chief Deputy City Attorney, John W. Heath, Senior Assistant City Attorney, Terry Kaufmann Macias, Senior Assistant City Attorney, Kathryn C. Phelan, Jennifer K. Tobkin, and Marvin E. Bonilla, Deputy City Attorneys for Defendant and Respondent.

**INTRODUCTION**

Westside Los Angeles Neighbors Network (appellant) filed a petition for writ of mandate in the Superior Court. The petition challenged several actions taken in March 2018 by the Los Angeles City Planning Commission (CPC) to facilitate and implement three components of the Westside Mobility Plan, a comprehensive study undertaken to develop short-term solutions and long-term plans for addressing congestion and mobility challenges in the western portion of the City of Los Angeles.[1] Appellant alleged the CPC's actions did not comply with the California Environmental Quality Act, Public Resources Code[2] section 21000 et seq. (CEQA), and sought an order directing the City to invalidate them. The trial court rejected most of appellant's contentions and denied the petition. For the reasons discussed below, we affirm.

**BACKGROUND**

I.     **Project Overview**

The Westside is an urban area experiencing significant traffic congestion due to many factors, including historical over-reliance on cars as the primary mode of transportation. To address transportation issues on the Westside, the Los Angeles City Council (City Council) directed the Department of Transportation and the Department of City Planning to

---

1      Throughout this opinion, we will refer to the City of Los Angeles as the "City" and will refer to the western portion of the City as the "Westside."

2      All undesignated statutory references are to the Public Resources Code.

undertake a comprehensive study to develop potential short-term solutions and long-term plans addressing congestion and mobility challenges within that part of the City. This study, known as the Westside Mobility Plan, seeks to facilitate a more balanced modal approach to improving mobility on the Westside. The Westside Mobility Plan has six components, three of which comprise the project at issue: (1) an update to the Coastal Transportation Corridor Specific Plan[3] (CTCSP); (2) an update to the West Side Los Angeles Transportation Improvement and Mitigation Specific Plan (WLA TIMP); and (3) the Livable Boulevards Streetscape Plan (Streetscape Plan).

We will refer to the updates to the CTCSP and WLA TIMP collectively as the "Fee Program Updates." The Fee Program Updates and the Streetscape Plan will be referred to collectively as the "Project."

### A. The Fee Program Updates

The CTCSP and WLA TIMP were adopted in 1985 and 1997, respectively, to establish a Transportation Impact Assessment (TIA) fee program. The TIA fees were established by specific plan ordinances and have been a part of the development approval process on the Westside since adoption. These fees

---

3      "A general plan is a 'charter for future development' within a city or county. [Citation.] It embodies fundamental policy decisions to guide future growth and development. [Citation.] Virtually all local decisions affecting land use and development must be consistent with the general plan. [Citations.] [¶] A city can adopt a specific plan to implement its general plan in a particular geographical area. [Citation.] A specific plan must be consistent with the general plan." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259-1260 (*Federation of Hillside*).)

provide a funding mechanism for transportation improvements needed to address and mitigate transportation impacts generated by new development in the areas covered by each specific plan.

Under the TIA fee program, developers pay a one-time fee to the City before issuance of any building, grading, or foundation permit. Those fees are then deposited into trust funds, which are used to implement the transportation improvements identified on lists in each specific plan.

The Fee Program Updates amend the CTCSP and WLA TIMP by: (1) revising the TIA fees required under each specific plan and corresponding ordinance through adjusting the formula used to calculate the amounts due for various types of land uses; (2) requiring the TIA fee to be paid for certain previously exempt land uses; (3) offering credits for affordable housing developments and transit oriented developments; and (4) updating each specific plan's list of transportation improvements to be funded in part by the updated TIA fees. Implementation of the transportation improvements on the lists in the CTCSP and WLA TIMP must comply with the Streetscape Plan approved by the CPC.

## B. The Streetscape Plan

In general, streetscape plans are tools designed to help guide the long-term implementation of streetscape improvements and document a community's vision for how a street looks and functions. A typical streetscape plan identifies a consistent palette of streetscape amenities, defines maintenance responsibilities for the city, businesses, and community partners, and develops a basis for pursuing funding opportunities. Streetscape plans seek to accomplish numerous goals, including enhancing walking and bicycling experiences on the street, improving pedestrian and bicyclist safety, bolstering local

businesses, improving connections to nearby transit, implementing sustainable practices, and improving corridor aesthetics.

The Streetscape Plan provides a blueprint for streetscape improvements on public rights-of-way in five key street segments located in the areas covered by the CTCSP and WLA TIMP. For each street segment, the Streetscape Plan sets guidelines and standards for numerous streetscape elements, including street trees and landscaping, sidewalk paving, street furniture, street lighting, bus zone amenities, pedestrian crossings, and other streetscape improvements. Its overarching goal is to create a safe, attractive, and pedestrian-friendly environment that promotes neighborhood identity, multimodal accessibility, and local commerce.

The Streetscape Plan does not itself specify how its streetscape improvements will be funded. Instead, the Streetscape Plan will be implemented as new projects, both publicly and privately financed, constructed over time. The Streetscape Plan's improvements are eligible for funding through the TIA fees obtained from the Fee Program Updates.

## II.    Relevant Actions Taken by the City and the CPC

In May 2014, the City issued a notice of preparation for the draft environmental impact report (DEIR). The City released the DEIR in January 2015. The DEIR noted its analysis was limited to the potential environmental effects of the Fee Program Updates, as the Westside Mobility Plan's other components, including the Streetscape Plan, "are not subject to CEQA review. . . ."

Following a 60-day circulation/review period, as well as a public hearing, the City published the final EIR. The EIR noted

that, notwithstanding the City's decision to prepare an EIR, the Fee Program Updates were statutorily exempt from CEQA under section 21080, subdivision (b)(8). It concluded the Fee Program Updates will have significant and unavoidable impacts to air quality, noise and vibration, and transportation.

At a meeting held in March 2018, the CPC, among other actions taken: (1) adopted the Environmental Resolution, which, among other things, certified the final EIR; (2) determined the Fee Program Updates are statutorily exempt from CEQA under section 21080, subdivision (b)(8); (3) determined the Fee Program Updates are categorically exempt from CEQA under Guidelines sections 15301, 15304, and 15308[4]; (4) adopted the Streetscape Plan pursuant to Los Angeles Municipal Code (LAMC) section 11.5.4; and (5) recommended that the City Council adopt the Fee Program Updates. That same day, the City filed a Notice of Determination (NOD) and a Notice of Exemption (NOE) for the Project.

## III.    Trial Court Proceedings

In June 2018, appellant filed a verified petition for writ of mandate challenging the certification of the EIR, the findings in the NOE, and "the related resolutions and ordinances designed to facilitate" the Fee Program Updates. The City demurred to the petition on the ground that the lawsuit was time-barred. The trial court sustained the demurrer with leave to amend.

---

4      The administrative regulations implementing CEQA appear in title 14, division 6, chapter 3 of the California Code of Regulations, and will be referred to as the "CEQA Guidelines" or "Guidelines."

Subsequently, appellant filed its operative first amended petition (FAP). The FAP not only challenges the EIR certification and the NOE findings, but also challenges "the related resolutions and Streetscape Plan designed to facilitate the Westside Mobility Plan . . . ."

After receiving full briefing on the merits and hearing oral argument, the trial court issued a comprehensive and detailed order denying the petition for writ of mandate. In rendering its decision, the trial court determined: (1) the CPC was a "decision-making body" with authority to certify the EIR; (2) substantial evidence did not support the City's determination that the Fee Program Updates are statutorily exempt from CEQA; (3) substantial evidence supported the City's determination that the Streetscape Plan is categorically exempt from CEQA; (4) appellant did not demonstrate the Streetscape Plan falls within the unusual circumstances exception to the application of categorical exemptions; and (5) the EIR was legally adequate. The trial court later entered judgment in the City's favor.

## DISCUSSION[5]

CEQA "declares that the maintenance of a quality environment is a matter of statewide concern. [Citation.] It requires state and local public agencies to consider the environmental impacts of their activities and prepare an EIR for any project that may have a significant effect on the environment. [Citations.] The purpose of an EIR is to inform decision makers and the public of the potential environmental impacts of a project and to identify feasible alternatives to the

---

5    The City's motion for judicial notice, filed on August 30, 2023, is denied for failure to demonstrate relevance.

project and measures to mitigate or avoid the adverse effects. [Citation.] The EIR must identify the significant effects on the environment, state how they can be mitigated or avoided, and identify alternatives to the project, among other requirements. [Citation.] The EIR serves as an informational document for the agency and the public but does not control the agency's exercise of discretion. [Citation.]

"The agency must notify the public of the draft EIR, make it available for public review and comment, and respond to comments. [Citations.] When significant new information shows that the project will have a different or more severe effect on the environment, the agency must notify the public and recirculate the draft EIR for review and comment. [Citations.] Before approving the project, the agency must certify that the final EIR was completed in compliance with CEQA and that the agency reviewed and considered the final EIR." (*Federation of Hillside*, *supra*, 83 Cal.App.4th at p. 1258, fns. omitted.)

"A proper party may petition for a writ of mandate to challenge the sufficiency of an EIR or the validity of an act or omission under CEQA. [Citations.] The standard of review of a quasi-legislative decision under CEQA is abuse of discretion. [Citation.] Abuse of discretion means the agency did not proceed as required by law or there was no substantial evidence to support its decision. [Citation.] In reviewing the adequacy of an EIR, the court does not determine whether the agency's factual determinations were correct but only decides whether they were supported by substantial evidence. [Citation.] Challenges to the scope of the analysis, the methodology for studying an impact, and the reliability or accuracy of the data present factual issues, so such challenges must be rejected if substantial evidence

8

supports the agency's decision as to those matters and the EIR is not clearly inadequate or unsupported [citations]. [¶] On appeal, we independently review the administrative record under the same standard of review that governs the trial court." (*Federation of Hillside*, *supra*, 83 Cal.App.4th at p. 1259.)

In asserting reversal of the judgment is required, appellant raises three main arguments: (1) the City failed to proceed in the manner required by law by allowing the CPC to certify the EIR; (2) the City erroneously determined the Streetscape Plan is categorically exempt from CEQA; and (3) the final EIR was legally inadequate because it insufficiently discussed the Fee Program Updates' growth-inducing impacts and did not ensure mitigation measure MM-T-2[6] will be implemented.[7] We address each in turn.[8]

---

6    Mitigation measure MM-T-2 is discussed in section III, below.

7    Appellant also asserts the City erroneously determined the Fee Program Updates are statutorily exempt from CEQA. As noted above, however, the trial court agreed with appellant on this point, but rejected all of its other arguments and, therefore, denied its petition for writ of mandate. Under these circumstances, we need not address appellant's statutory exemption argument, as it does not provide grounds for reversal.

8    Appellant's unopposed motion for relief, filed on May 21, 2024, is hereby granted. Accordingly, the version of appellant's reply brief filed on November 20, 2023 is stricken. Appellant's "intended reply brief" attached to its motion is accepted for filing and will be filed concurrently with this opinion.

Having reviewed appellant's intended reply brief, we note that it raises several points not previously mentioned or

## I. The CPC was authorized to certify the final EIR.

### A. Relevant Legal Principles

"The CEQA [G]uidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) provide an outline of the procedures required to certify an EIR and to approve a project. Certain tasks may be delegated, but others may not. The CEQA Guidelines specifically mandate that the decisionmaking body of a public agency shall not delegate the function of '[r]eviewing and considering a final EIR or approving a negative declaration prior to approving a project.' (CEQA Guidelines, § 15025, subd. (b)(1).) This guideline works in conjunction with the certification process for the final EIR. The CEQA Guidelines provide that prior to approval of a project, the lead agency must certify that (1) the final EIR complies with CEQA, (2) the final EIR was presented to the decisionmaking body of the lead agency and the decisionmaking body reviewed and considered the information in the final EIR prior to

---

adequately developed in its opening brief. It is well-settled, however, that "[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such a consideration would deprive the respondent of an opportunity to counter the argument" and "'[o]bvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant." (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) We therefore decline to address appellant's contentions, raised for the first time in its intended reply brief, that: (1) the CPC's adoption of the Streetscape Plan did not constitute "approval" of the Project under CEQA Guidelines section 15352; (2) the City failed to adopt required procedures to delegate EIR certification authority to the CPC; and (3) an agency may not apply a categorical exemption to some components of a project and not others.

approving the project, and (3) the final EIR reflects the lead agency's independent judgment and analysis. (*Id.*, § 15090, subd. (a).)" (*California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, 1335, fn. omitted (*Clean Energy*).)

"However, this is not to say that delegation is improper in all circumstances. The lead agency may delegate certain duties under CEQA, such as the certification of the final EIR, as provided by Public Resources Code section 21151. Public Resources Code section 21151, subdivision (c), states that '[i]f a nonelected decisionmaking body of a local lead agency certifies an environmental impact report, approves a negative declaration or mitigated negative declaration, or determines that a project is not subject to this division, that certification, approval, or determination may be appealed to the agency's elected decisionmaking body, if any.'[9] The CEQA Guidelines appear to provide for a similar delegation power, as it specifies that '[w]hen an EIR is certified by a non-elected decision-making body within a local lead agency, that certification may be appealed to the local lead agency's elected decision-making body, if one exists. For example, certification of an EIR for a tentative subdivision map by a city planning commission may be appealed to the city council. Each local agency shall provide for such appeals.' (CEQA Guidelines, § 15090, subd. (b).)" (*Clean Energy, supra*, 220 Cal.App.4th at p. 1335.)

Accordingly, under the CEQA Guidelines, "there are different duties and responsibilities assigned to lead agencies and decisionmaking bodies. The CEQA Guidelines define a 'lead

---

9      The parties do not dispute that, although permitted to do so under LAMC section 11.5.13, appellant did not appeal the CPC's certification of the EIR to the Los Angeles City Council.

11

agency' as 'the public agency which has the principal responsibility for carrying out or approving a project.' (CEQA Guidelines, § 15367.)" (*Clean Energy*, *supra*, 220 Cal.App.4th at pp. 1335-1336.) For purposes of this appeal, the parties do not dispute the trial court's finding that the City is the lead agency. "A 'decision-making body,' on the other hand, is defined as 'any person or group of people within a public agency permitted by law to approve or disapprove the project at issue.' ([CEQA Guidelines] § 15356.) In accordance with these guidelines, the lead agency for a particular project could be a city council, and the decisionmaking body can be a nonelected body such as a planning commission, so long as the planning commission has the ability to approve or disapprove the project at issue." (*Clean Energy*, *supra*, at p. 1336.)

## B.  Analysis

Appellant contends the CPC was not a "decision-making body" for the Project and, therefore, lacked authority to certify the EIR. In support of this position, appellant argues that where, as here, a project consists of multiple components, only the entity authorized to implement the component constituting the "primary source" of the project's environmental impacts may be considered a "decision-making body" with the ability to certify an EIR. In applying its proffered rule, appellant notes that although the CPC was authorized to adopt the Streetscape Plan pursuant to LAMC section 11.5.4, it was not likewise authorized to adopt the Fee Program Updates. Rather, only the City Council could take the latter action because, per LAMC section 12.32.C.1 and Government Code section 66016, subdivision (b), the City Council has exclusive authority to adopt amendments to specific plans, such as those contemplated in the Fee Program Updates.

12

Appellant therefore argues that since only the City Council could adopt the Fee Program Updates, which constitute the "primary source" of the Project's environmental impacts, the City Council—not the CPC—is the "decision-making body" authorized to certify the EIR under CEQA Guidelines section 15025, subdivision (b).

The gravamen of appellant's argument is that, for multi-component projects, we should take a "different approach" and adopt a new rule to determine whether an entity is a "decision-making body" authorized to certify an EIR. For the reasons discussed below, we decline to do so and, consequently, reject appellant's contention.

Adoption of appellant's suggested rule would improperly require us to disregard the relevant CEQA Guidelines informing whether an entity is a "decision-making body" permitted to certify an EIR. As noted above, under CEQA and the Guidelines, a non-elected decision-making body within a local agency may certify an EIR. (See *Clean Energy, supra*, 220 Cal.App.4th at p. 1335; see also § 21151, subd. (c); Guidelines, § 15090, subd. (b).) Section 15356 of the CEQA Guidelines defines "'[d]ecision-making body'" as "any person or group of people within a public agency permitted by law to approve or disapprove the project at issue." Per CEQA Guidelines section 15352, subdivision (a), "'[a]pproval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." And CEQA Guidelines section 15378, subdivision (a) states, in part, "'[p]roject' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the

environment . . . ." CEQA Guidelines section 15378, subdivision (c) further clarifies that "[t]he term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval."

Taken together, the applicable Guidelines establish that a "decision-making body" is any person or group of people within a public agency permitted by law to commit an agency to a definite course of action for a project. (CEQA Guidelines, §§ 15352 & 15356.) Under these Guidelines, the question whether an entity is a "decision-making body" for a multi-component project does not—as appellant suggests—turn on whether the entity can implement the portion of the project constituting "the primary source" of the project's environmental effects. (See *id.* §§ 15352, 15356, & 15378, subds. (a) & (c).) Instead, the inquiry focuses on whether the entity at issue can make a decision that commits the agency to a definite course of action with respect to the *whole* project, even if the project is subject to multiple discretionary approvals. (See *ibid.*)

Consequently, adoption of appellant's proffered rule would require us to discard the inquiry framed by the applicable Guidelines and create a new test for multi-component projects, which, so far as we can tell, is untethered to any provisions in CEQA or the Guidelines. This we cannot do. (See § 21083.1 ["It is the intent of the Legislature that courts, consistent with generally accepted rules of statutory interpretation, shall not interpret [CEQA] or the . . . [G]uidelines . . . in a manner which imposes procedural or substantive requirements beyond those explicitly stated in [CEQA] or in the [G]uidelines."].)

14

Applying the pertinent CEQA Guidelines, we agree with the trial court that "the CPC was authorized under CEQA as a decision-making body to certify the [final EIR]." (Italics and fn. omitted.) As the court observed, the Streetscape Plan and the Fee Program Updates are separate but intertwined components of the Westside Mobility Plan. This is because: (1) the streetscape improvements in the Streetscape Plan apply to five street segments located in areas covered by the CTCSP and WLA TIMP; (2) those improvements will be funded, in part, by the Fee Program Update's TIA fees; and (3) implementation of the transportation improvements on the updated project lists in the CTCSP and WLA TIMP must comply with the Streetscape Plan.

Given the overlap between the Fee Program Updates and the Streetscape Plan, we conclude that, by virtue of its power to adopt the Streetscape Plan, the CPC could make a "decision . . . commit[ting] the [City] to a definite course of action in regard to" the Project. (CEQA Guidelines, § 15352, subd. (a).) Thus, the CPC was authorized to "approve" the Project, even though further discretionary action by the City Council (i.e., adoption of the Fee Program Updates) was required to implement it. (See *ibid*; see also *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 134 [agency approval of a project may take place "even though further discretionary governmental decisions would be needed before any environmental change could occur"].) The CPC therefore was a "non-elected decision-making body" capable of certifying the EIR. (Guidelines, §§ 15090, subd. (b), 15356.)

The two cases on which appellant primarily relies, *Clean Energy*, *supra*, 220 Cal.App.4th 1325, and *Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770 (*Kleist*) do not assist it in demonstrating reversible error. In *Clean Energy*, the plaintiff

15

filed a petition for writ of mandate challenging the City of San Jose's (SJ) certification and approval of an EIR analyzing the potential environmental effects of a proposed update to SJ's general plan. (*Clean Energy*, *supra*, at p. 1331.) The trial court granted summary judgment in SJ's favor, finding the plaintiff failed to exhaust its administrative remedies. (*Ibid.*)

The appellate court reversed the judgment, holding, among other things, SJ improperly delegated its EIR certification authority to the planning commission, as the commission was a "nonelected nondecisionmaking body" for the project. (*Clean Energy*, *supra*, 220 Cal.App.4th at pp. 1331, 1338.) In support of its conclusion, the appellate court observed the planning commission could only make recommendations to the city council regarding the adoption, amendment, or repeal of a general plan, and could not itself adopt the proposed updates to the general plan. (*Id.* at p. 1338 & fn. 5.)

*Clean Energy* is distinguishable from the present case. In contrast to the planning commission in that case, the CPC was not limited to providing the City Council with recommendations on the Project's implementation. Instead, as discussed above, the CPC was authorized to adopt a key component of the Project, which was intertwined with the Project's other components. Consequently, unlike the planning commission in *Clean Energy*, the CPC had the ability to "approve" the Project, and was a "decision-making body" with authority to certify the EIR. (See CEQA Guidelines, §§ 15352, subd. (a), 15356.)

*Kleist*, *supra*, 56 Cal.App.3d 770, is also distinguishable. There, the project in question was a developer's request to rezone a 63-acre lot from single family residences to a planned development zone permitting multi-unit construction. (*Id.* at p.

16

772.) After the Glendale Environmental and Planning Board (Board) adopted the final EIR relating to the project, the Glendale City Council adopted a zone change ordinance as requested by the developer, with a few modifications per the recommendations by its planning commission. (*Id.* at pp. 775-776.) The plaintiffs filed a petition for writ of mandate, alleging the zone change was adopted without proper CEQA compliance. (*Id.* at p. 776.) In granting the petition, the trial court found the Glendale City Council—which the parties agreed was the decision-making body for the rezoning project—did not review or consider the final EIR before taking action on the project. (*Ibid.*)

On appeal, the developer argued the Glendale City Council "was not itself required to review and consider the EIR, since by ordinance it had delegated that function to the Board . . . ." (*Kleist*, *supra*, 56 Cal.App.3d at p. 778.) The appellate court rejected the contention as "contrary to the CEQA and the state guidelines." (*Ibid.*) In so doing, it observed: "The state guidelines require that the decision-making body or administrative official having final approval authority over a project involving a substantial effect upon the environment review and consider an EIR before taking action to approve or disapprove the project." (*Ibid.*) The court then explained: "Neither the CEQA nor the state guidelines authorize the city council to delegate its review and consideration function to another body." (*Id.* at p. 779.)

There is a key difference between *Kleist* and the present case, however. Specifically, as noted above, the parties in *Kleist* agreed that, for purposes of CEQA and the Guidelines, the Glendale City Council—not the Board—was the decision-making body for the rezoning project. (*Kleist*, *supra*, 56 Cal.App.3d at pp. 777, 779.) Consequently, when considering and rejecting the

17

developer's delegation argument, the *Kleist* court did not decide the issue presented in this case, i.e., whether an entity authorized to adopt a portion of a multi-component project is a "decision-making body" to whom a lead agency may delegate its authority to certify an EIR under section 21151, subdivision (c) and CEQA Guidelines section 15090, subdivision (b). Instead, the *Kleist* court considered whether a decision-making body could delegate its authority to an entity which was, without question, *not* a decision-making body for the project. (See *Kleist*, *supra*, at pp. 778-779.) *Kleist* therefore does not apply here.

### C.    Conclusion

For the reasons discussed above, we conclude appellant has not shown the CPC lacked authority to certify the final EIR and, consequently, has not demonstrated the City failed to proceed in the manner required by law by allowing the CPC to do so.

## II.    The Streetscape Plan is categorically exempt.

"By statute, the Legislature has . . . directed the Secretary of the Natural Resources Agency (Secretary) to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA. [Citation.] 'In response to that mandate,' the Secretary 'has found' that certain 'classes of projects . . . do not have a significant effect on the environment' and, in . . . [the] [G]uidelines, has listed those classes and 'declared [them] to be categorically exempt from the requirement for the preparation of environmental documents.'" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*).)

"Where the . . . issue is whether the lead agency correctly determined a project fell within a categorical exemption, we must

first determine as a matter of law the scope of the exemption and then determine if substantial evidence supports the agency's factual finding that the project fell within the exemption. [Citations.] The lead agency has the burden to demonstrate such substantial evidence. [Citations.]

"Once the agency meets this burden to establish the project is within a categorically exempt class, 'the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2.'" (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 185-186, fn. omitted (*Farm Bureau*).)

Preliminarily, we clarify the issue presented by the parties' categorical exemption arguments. Appellant asserts the City erroneously "claims that the Project qualified for categorical exemptions pursuant to Guidelines, sections 15301, 15304, and 15308." In response, however, the City only argues that the Streetscape Plan—rather than the entire Project—is categorically exempt from CEQA pursuant to the Guidelines cited by appellant. The City's argument on this point is consistent with its findings in the NOE, as well as the arguments it raised in the trial court, reflecting its position that only the Streetscape Plan was categorically exempt under CEQA Guidelines sections 15301, 15304, and 15308. We therefore limit our categorical exemption analysis to the Streetscape Plan.

## A. The Streetscape Plan is categorically exempt under CEQA Guidelines section 15301.

According to the City, "[s]ubstantial evidence in the record supports the Streetscape Plan is categorically exempt under Guidelines [s]ections 15301, 15304, and 15308." As discussed

below, we conclude the Streetscape Plan is categorically exempt from CEQA under Guidelines section 15301. Accordingly, we need not, and do not, address the application of the other two exemptions on which the City relies.

CEQA Guidelines section 15301 states, in relevant part: "Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use." In determining whether a project is exempt under Class 1, "[t]he key consideration is whether the project involves negligible or no expansion of use." (*Ibid.*)

As noted above, the Streetscape Plan delineates the standards and guidelines for numerous streetscape elements, including street trees and landscaping, sidewalk paving, street furniture, street lighting, bus zone amenities, and pedestrian crossings, applicable to public rights-of-way on five street segments in the Westside. For example, for each street segment, the Streetscape Plan defines the types of trees to be planted, the location and style of pedestrian lights, the type of striping to be used in new crosswalks, the specifications for raised landscaped medians, the location and style of seating/benches, and the location and style of trash receptacles. These standards and guidelines dictate minor alterations to existing rights-of-way, which will improve their aesthetics, functionality, and safety. The streetscape improvements do not expand the use of those rights-of-way. Thus, as the City observes, the contents of the Streetscape Plan demonstrate it falls within Class 1 and is exempt from CEQA pursuant to Guidelines section 15301.

In arguing that Guidelines section 15301 is inapplicable, appellant does not dispute the contents of the Streetscape Plan. Instead, its contention is based entirely on an excerpt of the Statement of Overriding Considerations adopted by the CPC through the Environmental Resolution. There, the CPC observed the EIR "identifies unavoidable significant impacts that would result from implementation of the updated CTSP and WLA TIMP," including unavoidable adverse impacts to air quality, noise and vibration, and transportation. Nothing in the Statement of Overriding Considerations, however, relates to the nature of the improvements to be accomplished through the Streetscape Plan, let alone addresses "[t]he key consideration [of] whether [the Streetscape Plan] involves negligible or no expansion of use [of existing public structures]." (CEQA Guidelines, § 15301.) Accordingly, we reject appellant's assertion that the City's finding that CEQA Guidelines section 15301 is inapplicable is unsupported by substantial evidence.

## B. Appellant has not shown the unusual circumstances exception applies.

Having concluded CEQA Guidelines section 15301 applies to the Streetscape Plan, we consider appellant's contention that the City may not rely on this provision to find the Streetscape Plan is categorically exempt because the Streetscape Plan falls within an exception set forth in Guidelines section 15300.2. Often referred to as the "'unusual circumstances exception'" (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1096, fn. 2), Guidelines section 15300.2, subdivision (c) states, in relevant part: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant event on the environment due to unusual circumstances."

21

There are "two alternative ways to prove the [unusual circumstances] exception." (*Citizens for Environmental Responsibility v. State ex. rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 574 (*Environmental Responsibility*).) "In the first alternative, . . . a challenger must prove both unusual circumstances and a significant environmental effect that is due to those circumstances. In this method of proof, the unusual circumstances relate to some feature of the project that distinguishes the project from other features in the exempt class. [Citation.] Once an unusual circumstance is proved under this method, then the 'party need only show a *reasonable possibility* of a significant effect due to that unusual circumstance.'" (*Ibid*, original italics.)

"In the second alternative for proving the unusual circumstance[s] exception, 'a party may establish an unusual circumstance with evidence that the project *will have* a significant environmental effect.' [Citation.] 'When it is shown "that a project otherwise covered by a categorical exemption *will have* a significant environmental effect, it necessarily follows that the project presents unusual circumstances." [Citation.]'" (*Environmental Responsibility*, *supra*, 242 Cal.App.4th at pp. 575-576, original italics.)

Appellant relies on the second method of proving the unusual circumstances exception. In so doing, it refers us to the portion of the Environmental Resolution adopted by the CPC, which recognizes the Fee Program Updates will "hav[e] significant effects that cannot be mitigated to a less-than significant level through the imposition of mitigation measures." The Environmental Resolution, however, contains no findings relating to whether the Streetscape Plan will have any significant

environmental effects. As appellant has not directed us to any other evidence supportive of its argument, we conclude it has not carried its burden of showing the Streetscape Plan falls within CEQA Guidelines section 15300.2, subdivision (c). (See *Farm Bureau, supra,* 143 Cal.App.4th at p. 186 [burden rests on challenger to "'show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2'"].)

## C. Conclusion

The City presented substantial evidence demonstrating the Streetscape Plan falls within CEQA Guidelines section 15301 and shifted the burden to appellant to "'show that [the Streetscape Plan] is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2." (*Farm Bureau, supra,* 143 Cal.App.4th at p. 186.) Appellant did not satisfy that burden. Thus, appellant has not shown the City abused its discretion by finding the Streetscape Plan is categorically exempt from CEQA.

## III. Appellant has not shown the EIR is legally deficient.

### A. Analysis of Growth-Inducing Impacts

According to appellant, the EIR is deficient because its "analysis of growth-inducing impacts was inadequate."

CEQA requires an EIR to "include a detailed statement setting forth . . . [t]he growth-inducing impact of the proposed project." (§ 21100, subd. (b)(5).) Guidelines section 15126.2, subdivision (e) explains that, per this statutory requirement, an EIR must "[d]iscuss the ways in which the proposed project could foster economic or population growth, or the construction of additional housing, either directly or indirectly, in the surrounding environment. Included in this are projects which

23

would remove obstacles to population growth (a major expansion of a waste water treatment plant might, for example, allow for more construction in service areas)."

In addressing the possibility of growth-inducing impacts, the EIR states, in relevant part: "The project area is currently a fully developed, populated urban area. While the [Fee Program Updates] could lead to transportation improvements, such as enhanced transit and bicycle facilities, which would improve mobility, the [Fee Program Updates] would not extend infrastructure to undeveloped areas or areas currently lacking adequate infrastructure. Rather, the transportation projects that would be implemented as a result of the updated lists of transportation improvements in the CTCSP and WLA TIMP would enhance the existing transportation network in the project area. Growth is expected in the project area with or without the amendments to [the CTCSP and WLA TIMP] and the [Fee Program Updates] would not change the amount or type of growth anticipated to occur. Implementation of the [Fee Program Updates] would facilitate movement within the CTCSP and WLA TIMP areas as growth continues. It would accommodate anticipated infill or density-related growth as envisioned in the Framework and Community Plans. Therefore, implementation of the transportation improvements associated with [the Fee Program Updates] would not directly or indirectly induce growth."

Although not entirely clear, appellant appears to contend the analysis above is deficient because it fails to address the concerns raised in two comments received on the draft EIR. We are not persuaded by this argument. As discussed below, the final EIR reflects the City adequately responded to those comments

24

and explained why, despite the relevant concerns expressed, the Fee Program Updates will not induce growth. And, on appeal, appellant does not dispute or challenge the sufficiency of the City's responses.

The first comment cited by appellant opines that, because the Fee Program Updates constitute "a land use plan posing as a transportation plan, [the EIR] fails to study or acknowledge growth inducing impacts of [the Fee Program Updates] including incentivizing affordable housing, [transit oriented developments (TOD)], and multi-family dwellings."

The City responded by first explaining, in detail, why the Fee Program Updates were not—as the comment asserted—"a land use plan." In so doing, the City observed the Fee Program Updates would not result in any changes in the general plan's land use designations or zoning classifications, nor would they "entitle or otherwise approve any of the transportation improvements identified in the fee program. Additionally, the [Fee Program Updates] would not approve or, in fact, provide any zoning or development standards or regulations for any new development, other than the adoption of a program to exact fees and mitigation." In addition, the City noted the commenter did not provide any substantial evidence showing the Fee Program Updates would result in induced growth.[10] Thus, the City maintained that, rather than inducing growth, the Fee Program

_____

10    CEQA Guidelines section 15204, subdivision (c) states, in relevant part: "Reviewers should explain the basis for their comments, and should submit data or references offering facts, reasonable assumptions based on facts, or expert opinion supported by facts in support of the comments."

25

Updates "would increase mobility options within the CTCSP and WLA TIMP areas as growth continues."

The City also addressed the comment's concern that the Fee Program Updates will incentivize construction of affordable housing. It explained: "The potential for the [Fee Program Updates] to result in growth inducing impacts through the TIA fee credits for the provision of affordable housing was evaluated in the Nexus Study (which was included in the Draft EIR as Appendix B). Specifically, Appendix E of that appendix considered the potential economic impact of an update to the TIA fee programs associated with the CTCSP and WLA TIMP, including the fee credits for affordable housing. The economic impact study concluded that the TIA fee credits for the provision of affordable housing would not change the broader fundamental economics of new development. In other words, the fee credit, alone, would not provide a great enough incentive so as to change the likelihood that affordable housing would be developed or not developed in the study area."

With respect to the comment's concern that TOD credit will give rise to further development, the City explained that, under the Fee Program Updates, "development near transit will still be subject to the TIA fee; the TOD credit allows for a 5% or 10% reduction in the TIA fee obligation for transit oriented developments near [metro line and bus] stations that meet specific criteria outlined in the [CTCSP and WLA TIMP]." It further observed the Fee Program Updates "would not entitle any new development, including TOD, nor would [they] modify zoning classifications or land use designations to specifically allow TOD." The City then noted "the [comment's] argument that the credit would incentivize new development is highly questionable

and is not supported by substantial evidence, as the program would also eliminate existing exemptions on residential uses and some commercial uses. Therefore, the [Fee Program Updates] would not induce growth as a result of the TOD credit."

The second comment cited by appellant does not—as appellant contends—"explain[ ] . . . that the credits provided to developers [under the Fee Program Updates] would direct and incentivize growth." Instead, it expressed the view that the affordable housing credit is unnecessary because, "[i]f the City is as out of balance with regard to affordable housing as [it] say[s], then [the City should] just limit all development for the next 5 to 10 year[s] to affordable housing[,]" which will result in developers building them "to stay in business." The City responded: "No further response is required because the comment does not raise any new significant environmental issues or address the adequacy of the environmental analysis included in the Draft EIR."

In sum, the EIR determined the Fee Program Updates will not have any growth-inducing impacts and set forth the rationale underlying this determination. The EIR's growth-inducing impacts analysis therefore was not "conclusory," as appellant contends. In addition, as noted above, appellant does not raise— and we do not discern—any issues with the City's responses to the comments on which appellant relies to challenge the adequacy of the analysis. Under these circumstances, we conclude appellant has not carried its burden of demonstrating that the EIR's analysis of growth-inducing impacts is deficient. (See *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 ["Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is

27

correct, thereby imposing on a party challenging it the burden of establishing otherwise"].)

### B. Adoption of Mitigation Measure MM-T-2

"CEQA does not expressly require a public agency to find that mitigation measures adopted for a project are feasible or that they will be implemented. Rather, CEQA requires the agency to find, based on substantial evidence, that the mitigation measures are 'required in, or incorporated into, the project'; or that the measures are the responsibility of another agency and have been, or can and should be, adopted by the other agency; or that mitigation is infeasible and overriding considerations outweigh the significant environmental effects. (§ 21081; [CEQA] Guidelines, § 15091, subd. (b).) In addition, the agency 'shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures' (§ 21081.6, subd. (b)) and must adopt a monitoring program to ensure that the mitigation measures are implemented (§ 21081.6, subd. (a)). The purpose of these requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded. (§ 21002.1, subd. (b).)" (*Federation of Hillside*, *supra*, 83 Cal.App.4th at pp. 1260-1261, fns. and italics omitted.)

Appellant contends the final EIR "was legally insufficient in that it failed to . . . ensure that mitigation measures would actually be implemented." Specifically, it asserts the City did not ensure mitigation measure MM-T-2 will be funded for implementation "over time," or establish standards for when it will be implemented. In so doing, it appears to argue that the City failed to comply with section 21081, subdivision (a)(1)

because the record lacks substantial evidence demonstrating mitigation measure MM-T-2 was "required in, or incorporated into," the Fee Program Updates.

Appellant's contention fails because, as set forth below, the record contains substantial evidence showing how mitigation measure MM-T-2 will be funded, and that its implementation is required upon satisfaction of specific conditions.

Mitigation measure MM-T-2 is also known as the Neighborhood Protection Program (NPP). The NPP is on the updated lists of projects to be funded by the TIA fees obtained through the Fee Program Updates. Per those lists, "[t]he objective of [the NPP] is to discourage through-traffic from using local streets and to encourage, instead, use of the arterial street system. The [NPP] will establish measures to make the primary arterial routes more attractive and local routes less attractive for through traffic, and establish measures designed to facilitate vehicular and pedestrian egress from local streets in the adjacent neighborhoods onto the primary arterial street and highways system."

In addition to explaining how the NPP will be funded, the draft EIR specifies when the NPP must be implemented by the Los Angeles Department of Transportation (LADOT). On this point, the draft EIR states: "As the City of Los Angeles implements projects in the updated project lists [in the amended CTCSP and WLA TIMP] that would impact vehicular operations by resulting in the removal of a vehicular travel lane along a roadway that could potentially result in diversion of traffic to adjacent residential streets, *LADOT shall implement the [NPP] on the impacted residential streets based on an analysis of project-specific impacts conducted according to LADOT Traffic Study*

29

*Policies and Procedures guidelines.*" (Italics added.) Immediately thereafter, the draft EIR reiterates: "MM-T-2 *requires* that the [NPP] included as part of the updated project lists be implemented when any loss of vehicular capacity results from other multimodal projects being implemented diverts traffic onto adjacent residential streets as determined through further project-specific traffic impact studies based on LADOT Policies and Procedures guidelines." (Italics added.)

This case thus is distinguishable from *Federation of Hillside, supra*, 83 Cal.App.4th 1252, the case on which appellant primarily relies to support its argument relating to mitigation measure MM-T-2. There, the plaintiffs filed a petition for writ of mandate alleging the City violated CEQA when approving a General Plan Framework (GPF) as an amendment to its general plan. (*Federation of Hillside, supra*, at pp. 1254-1255, 1257.) The GPF proposed several operational and physical improvements to traffic systems and infrastructure, policies to encourage the use of public transit and reduce vehicle trips, and other measures to reduce traffic congestion and improve accessibility. (*Id.* at p. 1255.) The GPF also identified several programs necessary to its implementation, including a proposed Transportation Improvement Mitigation Plan, which was described as a program to mitigate the transportation impacts of the GPF's land use and growth policies. (*Ibid.*) The GPF, however, did not require that the mitigation measures be implemented as a condition of the development allowed thereunder. (*Id.* at p. 1256.)

In reversing the judgment denying the petition for writ of mandate, the appellate court held, among other things, the City failed to comply with sections 21081 and 21081.6 when it approved the GPF. (*Federation of Hillside, supra*, 83 Cal.App.4th

30

at pp. 1261, 1267.) In support of its holding, the court explained: "The city acknowledged . . . that there was great uncertainty as to whether the mitigation measures would ever be funded or implemented. Although the city adopted the mitigation measures, it did not require that they be implemented as a condition of the development allowed under the GPF and made no provision to ensure that they will actually be implemented or 'fully enforceable.'" (*Id.* at p. 1261, fn. omitted.)

In contrast with the mitigation measures adopted in *Federation of Hillside*, the evidence discussed above reflects the City established how the NPP will be funded (i.e., through the fees obtained through amended TIA program) and required LADOT to implement the NPP upon satisfaction of specific conditions (i.e., when implementation of the other projects on the lists in the CTCSP and WLA TIMP diverts traffic onto adjacent residential streets as determined through project-specific traffic studies based on LADOT Traffic Study Policies and Procedures guidelines). Thus, appellant's reliance on *Federation of Hillside* to show reversible error is misplaced.

In sum, for the reasons discussed above, we reject appellant's argument that "[t]he City failed to comply with CEQA when it adopted Mitigation Measure MM-T-2 . . . ." Instead, we conclude the record contains substantial evidence to support a finding that mitigation measure MM-T-2 has been "required in, or incorporated into" the Fee Program Updates in compliance with section 21081, subdivision (a).[11]

---

[11] Because we affirm the judgment for the reasons stated above, we need not address the alternative grounds for affirmance raised in the City's brief.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, P. J.

We concur:


MORI, J.


ZUKIN, J.